## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CR-0085-CVE |
| | ) | |
| STANISLOV AVEZOV, | ) | |
| a/k/a Stanislov Avezlov, | ) | |
| a/k/a Robert Bernard, | ) | |
| OMAR SAADELDIN, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

Now before the Court is Defendants' Joint Motion to Suppress Tangible Evidence, Statements & Fruits of Search (Dkt. # 20). They argue that evidence seized during a search of a rental car on April 24 and 25, 2010 should be suppressed, because the Oklahoma Highway Patrol (OHP) trooper continued the traffic stop beyond its initial purpose without defendants' consent and without reasonable suspicion to believe that defendants were involved in criminal activity. Defendants are charged with possessing Oxycodone with intent to distribute in violation of 21 U.S.C. § 841(a)(1).  The Court held an evidentiary hearing on defendants' motion to suppress on July 23, 2010.

### I.

On April 24, 2010 around 11:45 p.m., OHP Trooper Ryan Smith was on patrol on a section of Interstate 44 (I-44) known as the Turner Turnpike and observed a gray Chrysler 300 pull into the toll booth lanes without signaling a lane change.  Smith turned on his emergency lights to initiate a traffic stop and the vehicle pulled over to the right side of the highway.  Omar Saadeldin was

driving the vehicle and Stanislov Avezov was seated in the front passenger seat.  Smith approached the vehicle from the passenger side and asked the driver, Saadeldin, for his driver's license. Saaldeldin produced a valid Arizona driver's license. Smith asked Saadeldin to sit in his patrol car while Smith completed a traffic citation and ran a records check, and Saadeldin complied with Smith's request.

Smith explained that he observed an illegal lane change and Saadeldin acknowledged that he changed lanes without using his turn signal.  Smith asked Saadeldin about his travel plans. Saadeldin stated that he had driven to Oklahoma City, Oklahoma from Phoenix, Arizona, and he decided to visit a friend in Tulsa, Oklahoma before leaving Oklahoma.  He claimed that he was on his way to visit a friend in Tulsa when he was stopped by Smith.  Saadeldin asked Smith if he would have to return to Oklahoma for a court hearing, and Smith said "no."  Smith asked Saadeldin where he worked, and Saadeldin stated that he owned two hookah lounges in Glendale and Phoenix, Arizona.  Saadeldin informed Smith that the vehicle was a rental car, and the rental agreement was in the glove box of the vehicle.  Smith asked Saadeldin who was traveling with him, and Saadeldin stated that his friend "Stan" was the passenger.  During the traffic stop, Saadeldin regularly engaged in conversation without questioning from Smith, and Smith testified that he perceived Saadeldin's conversation as a sign of nervousness.

Smith approached the passenger, Avezov, and asked for the rental agreement for the vehicle. Smith also asked Avezov about his travel plans, and Avezov stated that they were driving from Oklahoma City to Tulsa to visit family.  Smith testified that Avezov seemed extremely nervous and his voice was cracking.  Avezov had told Smith that he was sharing driving duties with Saadeldin and Smith wanted to check the status of Avezov's driver's license.  Smith spoke with Avezov for

2

approximately 40 seconds.  The rental agreement showed that the vehicle was rented by Michael Gutierrez from a Budget rental car location in Glendale, Arizona, and Saadeldin was an authorized driver for the rental car.  Smith also noticed that the vehicle had to be returned to Glendale by Monday, April 26, 2010.

Smith asked Saadeldin where he and Avezov were staying in Tulsa, and Saaldeldin stated that they were driving to a hotel.  Saadeldin knew the exact street address of the hotel, but he could not recall the name of the hotel.  Saadeldin clarified that he was visiting a friend named "Matthew Rosinski" in Tulsa, after further questioning from Smith about Saadeldin's and Avezov's purpose for visiting Tulsa.  Saadeldin also stated that they would be staying in Tulsa for only one night, because they had to return the rental car on Monday.  Smith asked Saadeldin about his occupation, and Saadeldin explained that a hookah lounge was a club or social lounge where guests used "middle eastern water pipes" to smoke flavored tobacco.  Smith asked Saadeldin where he and Avezov stayed in Oklahoma City, and Saadeldin stated that they stayed at the Biltmore hotel on Meridian Avenue.  Smith also asked Saadeldin if Avezov knew Rosinski.  Saadeldin claimed that Avezov had met Rosinki one time, but Rosinski was Saadeldin's long-time friend.  Smith pointed out the inconsistency between Saadeldin's and Avezov's statements about their purpose for visiting Tulsa, and Saadeldin explained that Rosinki was treated like his family because it was such an extended friendship.

Smith returned Saadeldin's driver's license and issued a warning citation to Saadeldin.  Saadeldin prepared to leave the patrol car, and Smith requested permission to ask Saadeldin some additional questions.  Saadeldin agreed to answer a few questions and remained seated in Smith's patrol car.  Smith asked Saadeldin if he had anything illegal in the car.  Specifically, he asked

Saadeldin about the presence of open containers of alcohol, weapons, illegal drugs, or large amounts of United States currency in the vehicle, and Saadeldin responded that none of these items were in the vehicle.  Smith asked for Saadeldin's consent to search the vehicle, and Saadeldin refused Smith's request on the ground that the vehicle contained items belonging to Avezov and he could not agree to the search.  Smith asked for clarification about his request to search the vehicle, and Saadeldin clearly stated that he was not consenting to a search of the vehicle.  Saadeldin asked if he was "good to go," and Smith told Saadeldin to stay in Smith's patrol car.  Smith informed Saadeldin that he would be calling for a canine unit and Saadeldin had to wait until the canine unit arrived. Smith then asked Avezov for his consent to search the vehicle, and Avezov's also denied Smith's request for consent.  Smith testified that he relied on three factors as a basis for reasonable suspicion to extend the traffic stop: (1) Saadeldin's and Avezov's conflicting stories about their purpose for visiting Tulsa; (2) the rental agreement was signed by a third party who was not present and the vehicle was rented in a "source"state; and (3) Saadeldin's and Avezov's nervous behavior.  The traffic stop took approximately 16 minutes from the time of the initial stop to Smith's decision to call for a canine unit.

Smith called for a canine unit to perform a sniff of the vehicle, and it took 54 minutes for the drug dog to arrive.  During this 54 minutes, Saadeldin remained in the patrol car with Smith, and Avezov was placed in a separate patrol car with OHP Trooper Paul Lakin.  Neither Saadeldin nor Avezov were given Miranda warnings, but Smith and Lakin engaged in conversation with Saadeldin and Avezov.  Saadeldin commented on Smith's laptop computer, and mentioned that he had a laptop computer in the trunk of the vehicle.  Smith asked Saadeldin if he "smoked weed" and Saadeldin denied that he used marijuana.  Smith then asked Saadeldin if Avezov "smoked weed," and

4

Saaldenin replied that he did not know.  Smith asked about Saadeldin's business operating a hookah lounge, and Saadeldin explained the process for smoking flavored tobacco from a water pipe.  Smith suggested that this process was similar to smoking marijuana from a "bong."   Much of the conversation during this time was initiated by Saadeldin, and concerned a wide range of topics, including the equipment in the patrol car, Saadeldin's attendance at Arizona State University, and BlackBerries and cellular telephones.  Saadeldin asked if he could get his cellular phone, but Smith told him to "sit tight" and did not permit Saadeldin to get his phone.

About 20 minutes after Smith called for the canine unit, Smith asked Saadeldin if he and Avezov were at a basketball game in Oklahoma City.  Saadeldin said that they were at a basketball game between the Oklahoma City Thunder and Los Angeles Lakers, but they left in the third quarter.  Smith asked which team was winning the game when they left, but Saadeldin claimed that he had been drinking alcohol and did not remember.  Smith noted in his police report that he did not detect an odor of alcohol on Saadeldin's breath.  Dkt. # 20, Ex. 1, at 1.  Smith asked Saadeldin about their tickets and the location of their seats, and Saadeldin stated that they sat in section 13A or 13B.  Saadeldin said the seats were "pretty high" in the Ford Center.  Smith used his laptop computer and found that there was no section 13A or 13B at the Ford Center.   Smith asked how long Saadeldin had known Avezov, and Saadeldin replied that he had known Avezov for about six or eight months.  Smith asked how well Saadeldin knew Gutierrez, and Saadeldin claimed that he knew Gutierrez "very well."  In the other patrol car, Avezov told Lakin that they watched the basketball game from a restaurant, but they did not actually attend the game.  Avezov also stated that he had been drinking alcohol, but Lakin did not smell any alcohol on Avezov's breath.

Assistant Chief Samuel Byrd of the Meeker Police Department arrived with a drug dog, Brutus. Brutus is certified by the National Narcotic Detector Dog Association to detect marijuana, methamphetamine, heroin, and cocaine. See Government Exs. 12-15. Byrd testified that he received a call from OHP around 12:15 a.m. on April 25, 2010. He completed writing a ticket for a traffic stop and left Meeker about three minutes later. It took him at least 25 minutes to drive to the location of the traffic stop and he testified that he arrived around 12:45 a.m. Smith testified that Byrd arrived about 45 minutes after he requested a canine sniff of defendants' rental vehicle.[1] Byrd allowed Brutus to become acclimated to his surroundings before starting the sniff of the vehicle, and he led Brutus to the front of the vehicle. Brutus began his sniff at the front bumper on the driver's side and walked counterclockwise around the vehicle. When Brutus completed a full loop around the vehicle, Brutus alerted to the smell of illegal drugs in front of the vehicle. Brutus is a passive alert dog and he alerts by sitting. Byrd led Brutus on a second loop around the vehicle, and Brutus made a "head throw" near the trunk. Byrd testified that a head throw is not a formal alert by Brutus, but it suggests that Brutus detects a faint odor of illegal drugs or that he cannot precisely locate from where the smell is coming. Brutus again alerted at the front of the vehicle after completing his second loop. Byrd conducted a third loop around the vehicle, and Brutus lifted his nose toward the trunk and alerted at the front of the vehicle. Based on Brutus' conduct, Byrd informed Smith that Brutus had alerted to the presence of illegal drugs inside the vehicle.

---

[1]     The DVD does not clearly show when Byrd arrived, but it does show when the canine sniff started. The amount of time between the completion of the initial purpose of the traffic stop and the initiation of the canine sniff is approximately 54 minutes. The government states that Byrd arrived 54 minutes after Smith requested a canine unit. Dkt. # 27, at 12. This statement is supported by the evidence and the Court finds that defendants were detained 54 minutes while waiting for the canine unit to arrive.

Smith and Lakin  conducted a vehicle search and found a blue American Eagle bag containing a small black container with two baggies of a green leafy substance.  The substance field tested positive for marijuana.  They also found $17,700 in United States currency in the bag.  In a separate computer bag, police found a laptop computer and 3,000 Oxycodone pills.  Saadeldin and Avezov denied that they were aware of the drugs.  Smith formally arrested Saadeldin and Avezov and transported them to the Lincoln County jail.  Smith read Saadeldin his <u>Miranda</u> rights at the jail, and Saadeldin refused to talk.  Lakin read Avezov his <u>Miranda</u> rights at the jail, and Avezov also refused to speak to police.  Law enforcement officials subsequently sought and obtained search warrants for the rental vehicle, as well as three laptop computers and six cellular phones found in the vehicle.

## II.

Defendants argue that Smith prolonged the traffic stop without reasonable suspicion, and any evidence seized after the initial purpose of the traffic stop was completed should be suppressed.  The government responds that Smith had reasonable suspicion to continue the traffic stop for a canine sniff, and the length of the detention, including the 54 minute wait for the canine unit to arrive, was reasonable under the circumstances.  Both defendants have standing under the Fourth Amendment to challenge the validity of the traffic stop.  <u>Brendlin v. California</u>, 551 U.S. 249 (2007); <u>United States v. White</u>, 584 F.3d 935, 945 (10th Cir. 2009).

A traffic stop is treated as an investigative detention, and such a stop is governed by the standards set forth in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  <u>United States v. Bradford</u>, 423 F.3d 1149, 1156 (10th Cir. 2005).  When determining the reasonableness of a traffic stop, a court must make two separate inquiries.  First, did the police officer have a valid reason for initiating the traffic stop.

United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995).  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Id.  Second, a traffic stop must not become an unnecessarily lengthy detention, but must be limited in scope to the purpose of the initial traffic stop.  United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007).  A police officer may extend the length of the traffic stop for questioning beyond the initial purpose of the traffic stop only if the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." United States v. Ramirez, 479 F.3d 1229, 1243 (10th Cir. 2007).

There is no dispute that defendants' rental vehicle was pulled over for failing to signal a lane change, and that this traffic violation occurred.  See Dkt. # 20, at 8 ("In all fairness, it appears that Mr. Saadeldin admitted to the trooper that he made a last-minute lane change.").  The government has shown that the first prong of Terry is satisfied.

The Court must also consider whether the length of the traffic stop was reasonable under the second prong of Terry.  An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation.  See United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001).  An officer may also "ask questions about the motorist's travel plans and authority to operate the vehicle," in addition to obtaining the relevant documentation, without exceeding the scope of an investigative detention.  United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006).  Such questioning does not violate the Fourth Amendment as long as the questioning does not prolong the traffic stop.  United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009); United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005).  Police must have

8

reasonable suspicion that criminal activity is afoot to continue a traffic stop beyond the purpose of issuing a warning or citation for the traffic violation.  United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995).  Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity."  Ornelas v. United States, 517 U.S. 690, 696 (1996) (internal quotation marks omitted).  An "inchoate and unparticularized suspicion or 'hunch' is insufficient" to support reasonable suspicion.  United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992) (internal quotations and citations omitted).  Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence."  Alcaraz-Arellano, 441 F.3d at1260 (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)).  In determining whether an officer had reasonable suspicion of criminal activity, the Court does not evaluate the facts in isolation but instead construes them together based on the totality of the circumstances.  United States v. Arivizu, 534 U.S. 266, 274 (2002).

Defendants argue that Smith lacked reasonable suspicion to extend the traffic stop beyond the purpose of completing a traffic citation, because there was no basis for Smith to determine that reasonable suspicion existed and defendants denied Smith's request for consent to search the vehicle.  They also argue that the traffic stop became an arrest at some point after Smith issued a warning citation, because defendants were not free to leave and there was an unreasonable delay before the canine sniff.  The government argues that Smith observed the following objective factors supporting his decision that reasonable suspicion existed to continue the traffic stop:

- the vehicle was a rental and was rented by a third party not present in the vehicle
- the vehicle was rented in Phoenix, Arizona, which is a known "source city" for illegal drugs
- defendants provided vague and inconsistent answers about their travels plans
- defendants' travel plans seemed implausible

9

- both defendants seemed exceedingly nervous

Dkt. # 27, at 9-13.

The Court finds that Smith's consideration of Phoenix as a "source" city is irrelevant and should not be considered in determining if he had reasonable suspicion to continue the traffic stop. The Tenth Circuit affords little or no weight to travel to or from a "source" location in the reasonable suspicion analysis.  See United States v. Lopez, 518 F.3d 790, 799 (10th Cir. 2008); United States v. Guerrero, 472 F.3d 784, 788 (10th Cir. 2007).  In Guerrero, the Tenth Circuit stated:

> The fact that the defendants were traveling from a drug source city . . . [or state] does little to add to the overall calculus of suspicion: "If travel between two of this country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention.  Our holding that *suspicious* travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se."

Guerrero, 472 F.3d at 788 (quoting United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005)). The Tenth Circuit clearly permits a district court to consider vague or inconsistent travel plans as factor to establish reasonable suspicion, but the identity of the cities or states as "source" locations is not a factor in the Court's analysis.

The government argues that Smith perceived both Saadeldin and Avezov as unusually nervous during the traffic stop, and this was a relevant factor to establish reasonable suspicion. Extreme nervousness of a driver or passenger, in combination with other factors, can be a factor used to establish reasonable suspicion to continue a traffic stop beyond its initial purpose.  United States v. Salazar, ___ F.3d ___, 2010 WL 2473162 (10th Cir. June 21, 2010).  However, this factor must be considered with other factors, and it may not be used as the sole factor to establish

reasonable suspicion.  In a recent Tenth Circuit decision, <u>United States v. Simpson</u>, ___ F.3d ___, 2010 WL 2559796 (10th Cir. June 28, 2010), the Tenth Circuit stated:

> "We have held consistently that nervousness is 'of limited significance' in determining whether reasonable suspicion exists."  Nervousness is of limited value in assessing reasonable suspicion for two reasons.  First, it is common for most citizens, "whether innocent or guilty-to exhibit signs of nervousness when confronted by a law enforcement officer."  Further, it is natural for a motorist to become more agitated as a stop is prolonged and particularly when the officer seems skeptical or suspicious.
>
> Second, unless the police officer has had significant knowledge of a person, it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously.

<u>Id.</u> at *5 (citations omitted).  The Tenth Circuit clarified that "[e]xtreme and persistent nervousness . . . 'is entitled to somewhat more weight,'" but a court may not rely solely on a police officer's perception of nervousness and must find objective indicators of extreme nervousness.  <u>Id.</u> at *6. Thus, if defendants exhibited extreme and prolonged nervousness, this is a relevant factor to determine if Smith had reasonable suspicion under the totality of the circumstances to extend the traffic stop beyond its initial purpose.

In this case, Smith testified that he observed objective indicia of Saadeldin's nervousness and he determined that Saadeldin's behavior was an indication that criminal activity was afoot.  Smith testified that, based on his training and experience, he relied on Saadeldin's excessive talkativeness and talking with his hands, lack of eye contact, yawning and deep breathing, coughing, and rubbing of his hands on his legs and face as objective evidence that Saadeldin was nervous beyond what should be expected in an ordinary traffic stop.  However, Smith acknowledged that, before he issued a warning citation, he did not observe any yawning and he heard only minimal coughing.  The Court has viewed the DVD of the traffic stop, and it confirms that Smith was excessively talkative and

generally failed to make eye contact with Smith.[2]  Saadeldin did not rub his hands on his face or legs, yawn, or cough in an excessive manner during the first 16 minutes of the traffic stop. However, the Court finds that Smith's testimony on the issue of defendants' nervousness is otherwise credible, and the behavior Smith observed before he issued a warning citation to Saadeldin could have been perceived as an indication of extreme or unusual nervousness.  In particular, Smith could reasonably have concluded that Saadeldin's conversation sounded like nervous chatter and Saadeldin's demeanor could have raised some suspicion that illegal activity was afoot.  As required by Tenth Circuit precedent, the Court will not give this factor significant or controlling weight in the reasonable suspicion inquiry, and the government must show that other objective factors supported Smith's decision that reasonable suspicion existed.

The government claims that defendants provided conflicting and vague travel plans when responding to Smith's questions, and this is a strong factor supporting Smith's determination that reasonable suspicion existed.  The government also argues that defendants' travel plans were implausible and this raised suspicion that defendants were trafficking illegal drugs.  The Tenth Circuit has repeatedly affirmed the use of this factor to establish reasonable suspicion.  White, 584 F.3d 935, 950 (10th Cir. 2009) ("Implausible travel plans can contribute to reasonable suspicion."); United States v. Karam, 496 F.3d 1157, 1164-65 (10th Cir. 2007) (inconsistent travel plans and confusion about travel details may be considered in conjunction with other factors to establish

---

[2]     The Court questioned Smith as to whether he could observe Saadeldin's eye movement and facial expressions in the patrol car, and Smith testified that he could see Saadeldin's eyes and facial expressions using his peripheral vision.  The Court finds that Smith's testimony is credible on this point.

reasonable suspicion); United States v. Hunnicut, 135 F.3d 1345, 1349 (10th Cir. 1998) (listing inconsistent details about travel plans as a relevant factor in the reasonable suspicion inquiry).

Defendants claim that the government has not identified a true or significant inconsistency in defendants' stories and Smith failed to gather enough information to determine if defendants' stories were actually conflicting. There is a clear inconsistency between Saadeldin's and Avezov's statements, and Smith could have considered these inconsistencies to establish reasonable suspicion. Saadeldin represented to Smith that he was traveling to Tulsa to visit a friend named "Matthew Rosinki" and Aveyoz told Smith they were driving to Tulsa to visit family.[3] Defendants argue that Smith had no way to know whether defendants' stories were actually inconsistent or even if both stories could have been true. However, defendants' stories were facially contradictory and Smith was not required to conduct an extensive investigation on this topic before considering this factor. The Court may not second-guess Smith's decision to consider this factor, nor may defendants attempt to explain away the inconsistency after the fact. Even assuming that Smith made a mistaken assumption that the stories were inconsistent, Smith's belief that defendants' stories were contradictory was reasonable under the circumstances. See United States v. Pena-Montes, 589 F.3d 1048, 1052-53 (10th Cir. 2009) (an officer's mistaken perception of a fact is still relevant to the reasonable suspicion analysis if the mistake was objectively reasonable). Smith also testified that defendants' travel plans seemed implausible or unusual to him, because defendants were driving to Tulsa that night and planned to drive at least 16 hours to Phoenix the following day. Smith found

---

[3]     The inconsistency about the Lakers game may not be considered, because Smith did not become aware of this inconsistency until after he decided to continue the traffic stop and call for a canine unit. Smith's police report suggests that he learned these facts before he issued a warning citation, see dkt. # 20, Ex. 1, at 1, but the DVD confirms that this topic did not arise until Smith had already requested a canine unit.

defendants' travel plans suspicious or implausible, and defendants have offered no explanation that would suggest that Smith's suspicion was unreasonable.  Smith could reasonably have questioned defendants' purpose for making such a lengthy trip for a limited stay in Tulsa, especially when defendants provided only a vague explanation for the trip.  See Kopp, 45 F.3d at 1453-54.  The short turnaround time in Tulsa and the inconsistency between Saadeldin's and Avezov's stories provided an objective basis for Smith to suspect that defendants were involved in illegal activity.

The government also argues that defendants' use of a rental vehicle and the fact that the vehicle was rented by a third party who was not present contributed to the totality of the circumstances supporting the existence of reasonable suspicion.  The status of a vehicle as a rented can be considered a factor to support the existence of reasonable suspicion, because it is accepted that drug traffickers frequently use rental vehicles to transport illegal drugs.  United States v. Lyons, 510 F.3d 1225, 1237 (10th Cir. 2007); United States v. Contreras, 506 F.3d 1031, 1036 (10th Cir. 2007); United States v. Williams, 271 F.3d 1262 (10th Cir. 2001).  It is also relevant that the vehicle was rented by a person who was not present.  United States v. Ma, 254 Fed. Appx. 752, 756 (10th Cir. Nov. 20, 2007).[4]  However, there is no dispute that Saadeldin was driving the vehicle and he was an authorized driver on the rental agreement.  Defendants' use of a rental vehicle and the rental by a third party who was not present were objective factors supporting probable cause.  These factors would be entitled to more weight if there was some indication that Saadeldin was not authorized to drive the vehicle or evidence suggesting that vehicle was rented under unusual

---

[4]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

circumstances, but Smith reasonably considered these factors to support the existence of reasonable suspicion that criminal activity was afoot.

The Court finds that Smith had reasonable suspicion to believe that criminal activity was afoot, and his decision to extend the traffic stop beyond the initial purpose of issuing a traffic citation was reasonable.  Smith observed objective indications of Saadeldin's nervousness, and reasonably considered this factor as part of the totality of the circumstances.  Smith also considered the status of the vehicle as rented and found it unusual that the vehicle was rented by a third party who was not present in the vehicle.  Smith testified that he found defendants' stories about their travel plans inconsistent, and the travel plans were implausible if the purpose of their trip to Tulsa was a social visit.  The Court gives no weight to Smith's consideration of Phoenix as a source city for illegal drugs.  The Court notes that this is a close case and Smith did not have any clear indications that defendants were engaged in illegal activity.  However, Smith's testimony about the factors he considered before he extended the traffic stop was credible, and he gathered sufficient objective evidence to determine that reasonable suspicion of illegal activity existed.

Defendants argue that the investigation detention became an arrest, because they were not free to leave and the length of the detention was excessive.  The government responds that the investigative detention did not become an arrest, because the length of time between the issuance of the traffic citation and the arrival of the canine unit was reasonable.  An investigative detention may be "transformed" into an arrest under the Fourth Amendment under certain circumstances. United States v. Hamilton, 587 F.3d 1199, 1215 (10th Cir. 2009).  "[I]f police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent."  United States v. Melendez-Garcia, 28 F.3d 1046, 1051

(10th Cir. 1994).  This may occur due to the use of handcuffs, firearms, or other police techniques inconsistent with the limited scope of an investigation detention, or the detention may become so lengthy that the investigation detention escalates into a de facto arrest.  White, 584 F.3d at 952-53. "An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2008) (quoting United States v. Munoz-Nava, 524 F.3d 1137, 1144 (10th Cir. 2008)).

Defendants argue that the length of time between the completion of the traffic stop and the dog sniff was excessive, but the mere fact that defendants were not free to leave while Smith waited for a canine unit to arrive did not automatically escalate the investigative detention into an arrest. "Officers with reasonable suspicion to believe that the occupants of a vehicle are engaged in the unlawful transportation of contraband may detain the vehicle for a reasonable time to obtain a properly trained dog to sniff for contraband." United States v. Mendoza, 468 F.3d 1256, 1261 (10th Cir. 2006) (40 minute detention was reasonable while police waited for nearest drug dog to arrive from approximately 50 miles away).  Based on Tenth Circuit cases, traffic stops totaling 50 minutes and delays up to 38 minutes for a canine unit have been found to be reasonable.  See Santos, 403 F.3d at 1124 (22 minute delay between denial of consent and arrival of drug dog was reasonable); United States v. Cervine, 347 F.3d 865 (10th Cir. 2003) (50 minutes for combination of traffic stop and dog sniff was reasonable); United States v. Villa-Chapparo, 115 F.3d 797, 802 (10th Cir. 1997) (38 minute delay was reasonable).  The Tenth Circuit has suggested that a lengthier delay may not violate the Fourth Amendment if police were acting diligently to expedite the traffic stop but

encountered unexpected delays.   United States v. Rosborough, 366 F.3d 1145, 1151 (10th Cir. 2004).

The government argues that the delay in this case was not unreasonable, because a canine unit was not available when Smith made his request and it took additional time to obtain a canine unit to search defendants' vehicle.  The government states and the evidence shows that 54 minutes passed from Smith's decision to extend the traffic stop and the arrival of the canine unit.  Smith testified that he was given a choice between an OHP canine unit or the next available canine unit. He informed the dispatcher that he would prefer an OHP canine unit, but he would accept the next canine unit that became available.  Byrd testified that he received a call from dispatch around 12:15 a.m. and left Meeker about three minutes later after completing a traffic stop.  He states that it took him approximately 25 minutes to reach the location on I-44 where Smith stopped defendant's vehicle.  He testified that he was not familiar with the area and he stopped to ask directions from another police officer on his way.  Smith testified that the traffic stop began around 11:45 p.m. on April 24, 2010 and it took about 16 minutes before he decided to extend the traffic stop and request a canine unit.  Smith requested a canine unit almost immediately after informing Saadeldin that he could not leave, and this means that it took approximately 14 minutes before dispatch contacted Byrd and asked him to assist Smith.  This additional 14 minutes is not attributable to any conduct of Smith, as his testimony and the DVD show that he promptly requested a canine unit.  However, this does not excuse the delay and it suggests that OHP did not act with urgency to obtain a canine unit.

While there is no evidence of bad faith or intentional delay, there was a substantial delay before a canine unit arrived and the length of the delay exceeds the delay approved in any Tenth

17

Circuit decision.  The total time of the traffic stop up to the time of the canine sniff, including the 54 minutes of delay for a canine unit to arrive, was 70 minutes.  This period of time reaches the outer boundaries for a limited investigative detention under the circumstances.  Other circuit courts of appeals have approved delays of up to one hour between a request for and the arrival of a canine unit if the delay was justified under the circumstances.  United States v. Vega, 72 F.3d 507, 515-16 (7th Cir. 1995); United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994); United States v. Frost, 999 F.2d 737 (3d Cir. 1993).  However, the government has not identified any circumstances that would justify a 54 minute extension of a routine traffic, and the length of the investigative detention was unreasonable.

Even assuming that the delay is not per se unreasonable, the Court must also consider whether the investigation escalated into an arrest before the canine unit arrived and if police needed probable cause, rather than reasonable suspicion, to continue the detention until the canine unit arrived.  Smith and Lakin separated Saadeldin and Avezov and put them in different patrol cars while they waited for the canine unit to arrive.  Smith testified that neither Saadeldin nor Avezov were given Miranda warnings while they waited for the canine unit to arrive.  The government argues that Miranda warnings were unnecessary, because defendants were not under arrest and they were not subjected to custodial interrogation.  The government is correct that Miranda v. Arizona, 384 U.S. 436 (1966), is generally not implicated by a routine traffic stop and a Miranda warning is not usually required in a valid Terry stop.  United States v. Eckhart, 569 F.3d 1253, 1275 (10th Cir. 2009).  However, this was not a routine traffic stop.  Defendants were detained for approximately 70 minutes and were held in separate patrol cars in the presence of a police officer.  The DVD from Smith's patrol car shows that he engaged in casual conversation with Saadeldin for almost the entire

54 minutes after he issued a warning citation and Saadeldin did not initiate all of the conversation. Smith asked Saadeldin if he "smoked weed" and asked Saadeldin if the water pipes used at a hookah lounge were similar to bongs for smoking marijuana. Smith also asked Saadeldin if Avezov "smoked weed." Even if Smith's questions did not constitute a direct interrogation, questioning implying that Saadeldin or Avezov engaged in illegal activity closely approximates police interrogation and a <u>Miranda</u> warning was required. <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980) (<u>Miranda</u> implies to express questioning or its "functional equivalent" that is likely to invoke an incriminating response from a suspect). Saadeldin was not free to leave the patrol car and he was subjected to questioning about criminal activity. Given the manner and length of the detention and the nature of the conversation, <u>Miranda</u> warnings should have been given to Saadeldin and Avezov if Smith and Lakin intended to converse with Saadeldin and Avezov before the canine unit arrived.

Considering the totality of the circumstances, the Court finds that the investigative detention did escalate into an arrest and police needed probable cause to continue the detention. The traffic stop lasted 70 minutes and this alone may have transformed the investigation detention into an arrest. During the 54 minute period of time waiting for the canine unit, Smith and Lakin placed defendants in separate patrol cars and engaged defendants in apparently casual conversation. However, at least two of Smith's questions concerned Saadeldin's possible involvement in illegal activity, and Smith did not give Saadeldin a <u>Miranda</u> warning. While it was permissible for Smith to briefly extend the traffic stop if a canine unit was not immediately available, this detention became excessively lengthy and it appears that police used this additional time to gather additional information about defendants' background and travel plans. The Court noted that this is a close case as to the existence of reasonable suspicion, and probable cause is a higher standard. The facts

known by Smith at the time he called for a canine unit do not give rise to probable cause to arrest

defendants for drug trafficking or any other crime.  Thus, the traffic stop became an unlawful arrest

under the Fourth Amendment

Defendants argue that any evidence during the search of their rental vehicle or discovered

as a result of that search must be suppressed under the exclusionary rule.  Under the exclusionary

rule, "the government may not introduce into evidence 'tangible materials seized during an unlawful

search [or] . . . testimony concerning knowledge acquired during an unlawful search.'" United States

v. Henderson, 595 F.3d 1198, 1201 (10th Cir. 2010) (quoting Murray v. United States, 487 U.S. 533,

536 (1988)).  The Court is also required to exclude evidence discovered as a result of the

exploitation of the illegal conduct, and this type of evidence is known as the fruit of the poisonous

tree.  Wong Sun v. United States, 371 U.S. 471, 488 (1963).  Evidence discovered only as a result

of a Fourth Amendment violation may not be admitted at trial.  United States v. Pettigrew, 468 F.

3d 626, 634 (10th Cir. 2006).  In this case, police found two plastic baggies of marijuana and

$17,700 of United States currency in a blue American Eagle bag and 3,000 Oxycodone pills in a

separate computer bag in defendant's rental vehicle.  Police later obtained search warrants for six

cellular phones and three laptop computers found in the rental vehicle, as well as a search warrant

for the vehicle itself.  None of this evidence would have been found but for the illegal detention of

defendant on April 24 and 25, 2010, and none of this evidence is admissible at trial.[5]

---

[5]  Defendants argue that other evidence, such as recordings of jailhouse telephone calls and
surveillance videos, may also be fruit of the poisonous tree.  The parties have not provided
this evidence to the Court and the source of this evidence is not clear from defendants'
motion, and the Court will not consider the admissibility of this evidence in this Opinion and
Order.  However, this evidence may be the fruit of the poisonous tree.

**IT IS THEREFORE ORDERED** that Defendants' Joint Motion to Suppress Tangible Evidence, Statements & Fruits of Search (Dkt. # 20) is **granted**, and any evidence seized during the search of defendants' rental vehicle or that was discovered as a result of this search is **suppressed**.

**DATED** this 29th day of July, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT